IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME BAILLIE RACHELLE DICKENSON THAT IS STORED AT PREMISES CONROLLED BY FACEBOOK | Misc. No. **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jonathon Parker with the United States Army Criminal Investigation

Command (Army CID), being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with the Facebook account known to be used by Baillie Rachelle

Dickenson, https://www.facebook.com/bailliehannah, and associated with Facebook ID number

508741638, that is stored at premises owned, maintained, controlled, or operated by Facebook

Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The

information to be searched is described in the following paragraphs and in Attachment A.  This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and

other information in its possession, pertaining to the subscriber or customer associated with the

user number or ID.

2.      I am an "investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct

investigations of and to make arrests for offenses enumerated in Title 18, United States Code,

Section 2516.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      I am a Special Agent with the United States Army Criminal Investigation Command (Army CID), conducting felony criminal investigations. I became a Special Agent in August 2005.  I received training to be a Special Agent at the CID Special Agent's Course in Fort Leonard Wood, Missouri.  I have continued to receive specialized law enforcement training in criminal investigation, including the Domestic Violence Intervention Training (DVIT) in 2004; the Child Abuse Prevention Investigative Techniques (CAPIT) training in 2006; the Advanced Crime Scenes Investigative Techniques Course (ACSITC) in 2007; the CID Special Agent Senior Leaders Course in 2012; and the Special Victims Unit Investigations Course in 2014.  As a Special Agent, I have investigated a variety of crimes to include homicide, aggravated assault, child abuse and neglect, child pornography, fraud, sexual assault, and identity theft.   I have sought and executed more than ten search and seizure authorizations as a Special Agent, including searches and seizures of electronic devices such as phones and computers.

4.      I also have received training in computer crime investigations.  I also own a computer and use computers in the course of my work in law enforcement and have personal knowledge regarding the operation of computers.  Based on this training, experience, and information provided to me by other law enforcement personnel involved in this investigation, I know the following:

a.      The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities.  In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer

system with direct access to the Internet.  The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

b.     With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world.  This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods; and

c.     Facebook is a popular "social network" form of transmitting messages and/or files in an electronic environment between computer users.

d.     Facebook is sometimes used by individuals to post photographs or comments relating to crimes that have been committed.

5.     I submit this affidavit based upon information known to me personally from this investigation, my training and experience, and information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein.  This affidavit is intended to show only that there is sufficient probable cause for the requested Authorization to Search and Seize, and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Baillie Rachelle DICKENSON (Mrs. DICKENSON) and/or Mr. Derreck Kyle DICKENSON (Mr. DICKENSON) have violated 18 U.S.C. § 113 (assault within the maritime and territorial jurisdiction of the United States), 18 U.S.C. § 1512 (obstruction of justice), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 4 (misprision of a felony) and other related crimes.  These crimes occurred in Germany but jurisdiction for these crimes lies in the United States pursuant to 18 U.S.C. § 3261 (Military Extraterritorial Jurisdiction Act).  There is

probable cause to search the property described in Attachment A for evidence of these crimes as further described in Attachment B.

### A.  JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i); see also 18 U.S.C. §§ 3261(a), 3238.

8.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## II.     STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS, 18 U.S.C. § 2703

9.   Title 18, United States Code, Sections 2701 through 2711, is entitled "Stored Wire and Electronic Communications and Transactional Records Access."  Title 18, United States Code, Section 2703(a) provides, in part:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

10.     Title 18, United Stated Code, Section 2703(b) provides, in part:

        (1) A governmental entity may require a provider of remote computing service to disclose the contents of any electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection–

                (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of jurisdiction;

11.     The government may also obtain records and other information pertaining to a subscriber to or a customer of an electronic communication service or remote computing service by way of a search warrant.  18 U.S.C. § 2703(c)(1)(A).  No notice to the subscriber or customer is required.  18 U.S.C. § 2703(c)(3).

## III.    FACTS ESTABLISHING PROBABLE CAUSE

12.     This investigation relates to the physical assault of Deacon Dickenson, who at the time of the assault was a two-month old male infant living in Kaiserslautern, Germany.   For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence relating to the assault of Deacon Dickenson will be located on the computer systems in the control of Facebook.

### A.  Background Related to Mrs. DICKENSON and Mr. DICKENSON

13.     The investigation has revealed that Mrs. DICKENSON and Mr. DICKENSON are married and have two children together, a daughter named Brynnleigh Dickenson, who was born on November 6, 2014, and a son named Deacon Dickenson, who was born on December 18, 2015.  At the time that these alleged offenses occurred, Brynnleigh Dickenson was 16 months old and Deacon Dickenson was two months old.  Mr. DICKENSON is an active duty member of the United States Army, namely an Army Specialist employed as a mechanic, stationed in Kaiserslautern, Germany.  At the time that these alleged offenses occurred, Mrs. DICKENSON,

Mr. DICKENSON, and their two children resided together on post in military housing in an apartment in the Vogelweh family housing complex in Kaiserslautern, Germany.   My investigation has also revealed that the DICKENSON family lived alone in their shared apartment, and that they did not avail themselves of any outside childcare such as a daycare, babysitter, or nanny/au pair.[1]

14.     A review of Department of Defense Personnel Search records revealed that Mrs. DICKENSON, Brynnleigh Dickenson, and Deacon Dickenson are all civilian dependents of Mr. DICKENSON, a U.S. Army service member.  As such, at the time that the alleged offenses occurred, Mrs. DICKENSON, Brynnleigh Dickenson, and Deacon Dickenson were "accompanying the Armed Forces outside the United States" for purposes of 18 U.S.C. § 3261(a) (Military Extraterritorial Jurisdiction Act).  See 18 USC § 3267(2)(A)(i) ("'accompanying the Armed Forces outside of the United States'" includes being a dependent of a member of the Armed Forces and residing with that member outside of the United States).

15.     The investigation has revealed that Mrs. DICKENSON uses the Facebook account https://www.facebook.com/bailliehannah, associated with Facebook ID number 508741638, and the Twitter account www.twitter.com/bailliedickens1 associated with Twitter ID number 4719327809.

---

[1]  During an interview with Army CID Special Agents on March 14, 2016, Mrs. DICKENSON stated that the only people who had ever been left alone with Deacon Dickenson were her mother Dana Mooney-Hannah, "for about an hour at a time and only a few times," Mr. DICKENSON, and Mrs. Chelsea Cox, who watched her children for her when she would shower.  During an interview with Army CID Special Agents on March 14, 2016, Mr. DICKENSON stated that Deacon Dickenson "has never been to a babysitter" and that besides him and Mrs. DICKENSON, no one else had been left around Deacon Dickenson or Brynnleigh Dickenson for an extended period of time.

**B. Deacon Dickenson's Injuries**

16.     The investigation has revealed that on March 12, 2016, at about 5:45 p.m., Mrs. DICKENSON and Mr. DICKENSON brought their infant son Deacon Dickenson to the emergency room at Landstuhl Regional Medical Center (LRMC hospital) in Landstuhl, Germany, claiming that he had been injured when his sister Brynnleigh Dickenson stepped on his chest.  Medical personnel examined Deacon Dickenson and observed bruising on his chest, back, side, and face.  X-rays were taken of Deacon Dickenson which revealed numerous fractured ribs in various stages of healing, which indicated that some of the fractures were older and had begun to heal while others were more acute.  The nature of the injuries caused medical personnel to suspect that Deacon Dickenson was the victim of non-accidental trauma, or child abuse, and medical personnel accordingly notified the Family Advocacy Program (FAP) of the case.[2]  Due to the severe nature of the injuries to an infant child, Deacon Dickenson was transferred to University Hospital of the Saarland, also known as Homburg University Hospital, for further treatment by its specialized pediatrics department.

17.     The investigation has further revealed that on March 16, 2016, medical personnel at LRMC hospital conducted a full skeletal x-ray examination of Brynnleigh Dickenson which revealed no evidence of any fractures.

18.     On March 18, 2016, Army CID Special Agent Jessica Lewis spoke with Dr. Daniel Aldana, a pediatrician at LRMC hospital.  Dr. Aldana stated that Deacon Dickenson had very severe brain swelling and that the left side of his brain x-ray was black with no brain activity.  He further stated that Deacon Dickenson had bleeding in his eyes, which indicated that his retina had come apart due to abusive head trauma and that he had also suffered posterior rib

---

[2] The Family Advocacy Program is a military program that assists in cases involving child abuse and domestic abuse.

trauma.  Dr. Aldana stated that the type of retinal trauma and posterior rib trauma Deacon

Dickenson had suffered were, to a reasonable degree of medical certainty, only seen in cases of

child abuse.

19.     Medical records obtained from the University Hospital of the Saarland indicated

the following: Deacon Dickenson was treated as an inpatient at University Hospital of the

Saarland from March 12 to March 24, 2016.  Medical personnel there diagnosed him with

"Battered-Child Syndrome", "[s]evere hypoxic brain damage", "[r]etinal bleeding on both

sides", "serial rib fracture on both sides", "clavicle fracture on the right", and "convulsions."

Deacon Dickenson suffered multiple hematomas and his x-rays showed between seven and

eleven rib fractures, including older rib fractures that were already healing at the time of the

treatment for his more acute non-accidental trauma injuries.  Mrs. DICKENSON told medical

personnel there that her daughter Brynnleigh Dickenson had jumped off of a couch and

accidentally landed on Deacon Dickenson while he was lying on his stomach.  Mrs.

DICKENSON and Mr. DICKENSON claimed that they were not in the room when this

happened, but that they heard Deacon Dickenson scream and then saw Brynnleigh Dickenson

taking her foot off of Deacon Dickenson.  Thereafter Deacon Dickenson cried immediately and

persistently.  An MRI of Deacon Dickenson's brain revealed bilateral subdural hematomas of

different ages.  The medical records stated that the "[t]he different fracture age and fracture

distribution indicates BCS (Battered Child Syndrome)."  The records also noted that "[o]n the

morning of 03/13/2016, Deacon developed cerebral complex partial seizures on the left. . . .  An

eye doctor's case conference on the admission day showed massive fresh retinal hemorrhages on

the left side and individual retinal hemorrhages on the right."  The records also stated that

"[b]leeding was found on both sides inside the head and retinal bleeding as well which indicative

[sic] for a shaken baby trauma and massive brain damage.  Also recorded are serial rib fractures

on both sides, a left clavicle fracture, [and] hematomas of various ages all over the body . . . ."

20.      On March 24, 2016, Deacon Dickenson was relocated from University Hospital

of the Saarland back to LRMC hospital in stable general condition.

21.      The investigation has further revealed that on or about April 6, 2016, LRMC

hospital medical personnel placed Deacon Dickenson in Medical Protective Custody, because his

treating physician at LRMC hospital determined "the child's many serious injuries clearly

indicative of physical child abuse, and asserting that no safe environment has been identified for

this child at this location."

22.      On May 3, 2016, a hearing was held before Judge Dillenkofer, a district court

judge of the Family Court located in Kaiserslautern, Germany to address whether Deacon

Dickenson, who was in protective medical custody, would be moved from Germany to the

United States.  Judge Dillenkofer subsequently issued an order stating that decisions regarding

the residence and medical custody of Deacon Dickenson would be made by the Kaiserslautern

Youth Welfare Office as a complemental care-giver.  The judge's order further stated that

Deacon Dickenson would be transferred unaccompanied by his parents to a children's hospital in

Kansas City, Missouri, and that Mr. DICKENSON and Mrs. DICKENSON had agreed to this

measure.  The judge's order further stated that the parents had agreed that the choice of the

child's residence and medical custody was handed to the Youth Welfare Office of Kaiserslautern

to oversee Deacon Dickenson's transfer to Missouri.

23.      On or about May 17, 2016, Deacon Dickenson was flown with a military escort

from LRMC hospital to Walter Reed National Military Medical Center (Walter Reed) in

Bethesda, Maryland.  On May 18, 2016, Deacon Dickenson was flown from Walter Reed to

Children's Mercy Hospital in Kansas City, Missouri.  On or about May 23, 2016, Deacon

Dickenson was placed with his maternal grandmother, Mrs. Dana Mooney-Hannah, who lives in

Missouri.

24.      On May 25, 2016, Judge Martina L. Peterson of the Circuit Court of Jackson

County, Missouri, Family Court Division issued an order for Deacon Dickenson to remain in

protective custody and in the temporary legal custody of the Children's Division for appropriate

placement.  Judge Peterson also ordered that there be no contact between Deacon Dickenson and

Mrs. DICKENSON or Mr. DICKENSON.

**C.  Mrs. DICKENSON's Communications about Deacon Dickenson's Injuries on
    Facebook and Twitter**

25.      On March 13, 2016, Mrs. DICKENSON posted the following message under her

username on Facebook: "Update on Baby Deacon: they had to put him under for an MRI since

him and sis bumped heads :'( and now he is in the NICU. . . . I can't handle this" (ellipsis period

in original).  Based on my training and experience and the investigation of this case, I understand

Mrs. DICKENSON to be claiming in this post that Deacon Dickenson's injuries resulted from a

physical incident between him and his then 16-month-old sister Brynnleigh Dickenson.

26.      On or about March 13, 2016, Mrs. DICKENSON posted the following message

under her username on Facebook in response to a posting by a Facebook user under the

username Crystal Dolan: "Mom guilt is the absolute worst!!!  I just keep replaying yesterday if I

would have just moved the bouncer over a little bit he would be okay.  If we would have taken

turns getting ready they would both be fine."

27.      The investigation has revealed that on or about March 31, 2016, a narrative

authored by Mrs. DICKENSON was posted on Facebook on Mrs. DICKENSON's behalf by

another Facebook user, regarding the injuries to Deacon Dickenson.[3]   In this Facebook posting,

Mrs. DICKENSON stated, inter alia, 1) that her 16 month old daughter fell from a couch onto

her 2 month old son while he was in a bouncer chair; 2) that she was out of the house all day

getting her hair done; 3) that she took her children to the hospital and learned that her son had

broken ribs and an injury on the left side of his head, and that her daughter had a concussion; 4)

that the "Army doctor automatically assumed it was abuse," 5) that her "son's ribs showed

different aging in the healing process but I have brittle bone disease and was diagnosed at 16

years old," 6) "It could also be a vitamin D deficiency because we live in Germany.  I requested

testing for rickets, and a few other possibilities and they've all been denied," 7) "My son has

completely recovered from the incident", 8) "They are ruining our lives over one accident and its

breaking my heart," 9) "I am grateful to God that my babies are now fully recovered and it gives

me the strength to fight for them," and 10) "Share this until someone listens. Until someone

helps our family.  The military should not have power like this with no oversight."

28.     The investigation has revealed that the medical personnel who have examined

Deacon Dickenson unanimously believe, to a reasonable degree of medical certainty, that the

serious injuries that he suffered could not have resulted from accidental trauma such as his 16-

month old sister falling on top of him from a sofa; that there is no evidence that Brynnleigh

Dickenson was presented to LRMC hospital on March 12, 2016 with a concussion or received

---

[3]  It appears that a person with a Facebook username of Crystal Dolan posted the narrative on behalf of
Mrs. DICKENSON.  The posting tags Facebook user "Baillie Rachelle Dickenson," and also begins as
follows: "I am posting this for my friend Baillie.  We have (a few of the friends she has here) done
everything in our power to keep this private but seeing as we have exhausted all the options I am asking
you to share her statement."  The narrative that follows is written in the first-person voice of Mrs.
DICKENSON.

treatment for a concussion; and that Deacon Dickenson has not undergone a complete recovery from his injuries.

29.     On March 31, 2016, Special Agent Lewis spoke to Dr. Aldana from LRMC hospital to ascertain the status of Deacon Dickenson and learned that the effects of the neurological head trauma would not be fully understood until the infant child was older, such as six months to a year old.  Dr. Aldana stated that he never told the DICKENSON family that Deacon Dickenson was doing well, only that he would not die from his injuries.  Dr. Aldana also stated that Mrs. DICKENSON came to him on several occasions and brought different research to him to explain Deacon Dickenson's injuries,[4] and that she also told Dr. Aldana that she had spoken with another doctor who contradicted the results of any tests conducted on Deacon Dickenson, but that she could not provide the name of this other doctor.

30.     Mrs. DICKENSON has also posted messages on Facebook about Deacon Dickenson, his injuries, and what caused his injuries on a Facebook page titled "KMC Babies of 2016."[5]  In one such posting dated March 13, 2016 she wrote: "So if you're going to judge please don't . . . you try having two babies 13 months and 12 days apart…Brynnleigh fell off the couch onto Deacon today (who was laying in his vibrating bounce) and broke 6 of his ribs, and

---

[4]  Through my training and experience, and from conversations with other law enforcement personnel, I have learned that criminals and co-conspirators often conduct internet searches regarding their crimes, both before and after committing them. This research may include how to commit certain crimes; how to defend against certain crimes; how to avoid detection of law enforcement; and how to dispose of evidence or otherwise cover up certain crimes.  This evidence may be probative of the identity of a perpetrator, as well as of a perpetrator's intent.  Evidence of such internet searches may be contained in web browser histories and other files contained in computers, mobile phones, and tablets, amongst other devices.

[5]  Through my training and experience, I believe that the Facebook page "KMC Babies of 2016" is a page for parents of children born in or around 2016 in Kaiserslautern, Germany.  KMC is believed to be an abbreviation for "Kaiserslautern military community."

she has a concussion.  I am devastated for both my babies.  I already feel like the worst mom in the entire world I don't need anyone telling me I am!"  (ellipses periods in original).

31.     On March 14, 2016, Mrs. DICKENSON posted the following on the "KMC Babies of 2016" Facebook page: "Ladies Deacon had [sic] taken a turn for the worst and my heart is breaking. My poor baby is not being properly cared for at Homburg and there is nothing I can currently do about it. :'(".

32.     Mrs. DICKENSON has continued to be active on her Facebook page as recently as May 12, 2016.  However, because Mrs. Baillie maintains a private Facebook page, not all of her Facebook activity is viewable by Army CID Special Agents.

33.     The investigation has further revealed that Mrs. DICKENSON has a Twitter account under the name @bailliedickens1 from which she has posted during the period following Deacon Dickenson's hospitalization, to include posts related to the treatment of Deacon Dickenson and her family.  She has posted on Twitter regarding her son's condition at times under the hashtag categories "BringDeaconHome", "Babygate", "ArmyScandal", and "MedicalKidnap."

34.     Mrs. DICKENSON posted the following on her Twitter account on April 23, 2016: "First Day Home…looks like a happy and content new born to me. #Babygate #BringDeaconHome #MedicalKidnap."  The post accompanied a photo of a newborn baby lying on a dark surface.  Mrs. DICKENSON posted the following on her Twitter account on April 24, 2016: "Deacon's 2nd day home, sleeping peacefully in his crib...any signs of abuse?  No!!! #Babygate #BringDeaconHome" (ellipsis in original).  The post accompanied a photo of a newborn baby lying under a striped blanket.  On both of these dates Deacon Dickenson remained hospitalized at LRMC and had not been discharged to Mrs. DICKENSON or to her home.

35.     Mrs. DICKENSON posted about her son on her Twitter account as recently as

May 4, 2016.  She has directed posts from Twitter regarding Deacon Dickenson to a number of

news outlets including CNN and ABC Politics, and to politicians and celebrities, including

President Obama, Hilary Clinton, The Ellen Show, and Dr. Phil.

**D.  Information Provided by Witnesses Acquainted with Mrs. DICKENSON**

36.     The investigation has revealed a civilian witness, Witness A, who knows Mrs.

DICKENSON and participated in the past in play groups with Mrs. DICKENSON and several

other parents of young children in 2015.  Witness A stated that over the course of the play groups

Witness A and some other parents observed that Mrs. DICKENSON was aggressive towards

Brynnleigh Dickenson verbally and would shake her fist at Brynnleigh Dickenson.  Witness A

also heard Mrs. DICKENSON say "I'm going to throw Brynnleigh against the wall" at a time

when Brynnleigh Dickenson was crying.  Witness A further stated that Mrs. DICKENSON

informed Witness A and others that she received mental health services and suffered from mental

health ailments; and that she had been reported to housing for child neglect when Brynnleigh

Dickenson was born because of Brynnleigh Dickenson's crying.[6]  Witness A further stated that

Witness A had never seen Mrs. DICKENSON or Mr. DICKENSON hit either of their children.

37.     The investigation has revealed a civilian witness, Witness B, who has known Mr.

and Mrs. DICKENSON since August 2014.  Witness B stated that Witness B saw Mrs.

DICKENSON verbally and physically abuse Mr. DICKENSON on more than one occasion.

Specifically, Witness B stated that Mrs. DICKENSON would punch Mr. DICKENSON in the

arms, slap him in the face, push him into walls, and grab his nipples and genitals and twist them.

---

[6] Army CID Special Agents consulted with the relevant housing authority but have yet to locate any other
evidence of such a report being made against Mrs. DICKENSON.

Witness B stated that while in Mrs. Dickenson's home, Witness B saw Mrs. Dickenson throw objects at Mr. DICKENSON such as dishes, brushes, and remote controls.

38.     The investigation has further revealed that Witness B participated in the past in play groups with Mrs. DICKENSON and several other parents of young children.  Witness B stated that during playdates in Mrs. DICKENSON's home, Mrs. DICKENSON would scream at her daughter Brynnleigh Dickenson that if she did not stop screaming she was going to throw her daughter against a wall.  Witness B also heard Mrs. DICKENSON say that she wished she lived on a higher floor so that she could throw Brynnleigh Dickenson out of the balcony.  Witness B stated that after Mrs. Dickenson gave birth to her daughter in November 2014, she stated on multiple occasions that she would rather kill herself than have another baby.  Witness B stated that Mrs. DICKENSON told Witness B that she would never love Deacon Dickenson the way she loved Brynnleigh Dickenson, that she should not have kept him, and that the baby was ruining her marriage.

39.     The investigation has further revealed that Mrs. DICKENSON told Witness B that a doctor had prescribed her 250 mg of Zoloft a day but that Mrs. DICKENSON did not take the medicine as directed.  Zoloft is a prescription medication used to treat depression and other conditions.

40.     The investigation has further revealed that Witness B once went to Mrs. DICKENSON's home to help with her children and retrieved Deacon Dickenson from his crib to change his diaper.  Witness B saw that Deacon Dickenson had what appeared to be broken blood vessels in his left eye.  Witness B observed Deacon D Dickenson's eye injury in mid to late February 2016.  Witness B described that the broken blood vessel covered at least half of Deacon Dickenson's eye and that Mrs. DICKENSON did not take Deacon Dickenson to a doctor to have

his injury treated.  Witness B asked Mrs. DICKENSON about the injuries and she replied that they were caused by Deacon Dickenson straining to have a bowel movement.

41.    On March 12, 2016, Witness B saw a Facebook message from Mrs. DICKENSON requesting prayers as she was going to LRMC hospital.  Witness B went to Mrs. DICKENSON's home on the evening of March 13 or 14, 2016 to discuss what happened to Deacon Dickenson.  At one point, Mrs. DICKENSON shouted, picked up Brynnleigh Dickenson and held her high above her head, and shook her vigorously while repeating that was a child abuser, while laughing.

42.    Witness B also stated that Mrs. DICKENSON would video chat with her mother often on Skype and Facebook Video Chat when Witness B was at Mrs. DICKENSON's home. Witness B stated that Mrs. DICKENSON communicated with Witness B via Facebook, WhatsApp, Instagram, and Pinterest.

43.    Witness B further stated that Mrs. DICKENSON has at least two cell phones, both of which are white smart phones.  Witness B stated that Mr. and Mrs. DICKENSON used their Xbox gaming device to access the Internet, including to access Facebook and other social networking accounts and to communicate with their family members outside of Germany.

44.    On March 17, 2016, Special Agent Lewis spoke with Mrs. Dana Mooney-Hannah, the mother of Mrs. DICKENSON, by telephone.  Mrs. Mooney-Hannah stated that she had seen Deacon Dickenson on Friday March 11, 2016, the day before Mr. and Mrs. DICKENSON brought him to LRMC hospital, via Skype and that he smiled and cooed at her on the Skype call, which caused her to be shocked when she received a call from Mrs. DICKENSON that Deacon Dickenson was in the hospital.

### E.  Statements from Mrs. DICKENSON and Mr. DICKENSON

45.      On the late evening of March 12, 2016, Mrs. DICKENSON went to University

Hospital of the Saarland where Deacon Dickenson was being treated.  She told hospital

personnel there that Deacon Dickenson's sister had jumped off of the couch and accidentally

landed on Deacon Dickenson, who had been lying on his stomach.  Mrs. DICKENSON

subsequently told hospital staff there that her husband caused the injuries to Deacon Dickenson

and that she was not home when he was injured.  Mrs. DICKENSON stated that when she came

home Deacon Dickenson was whining and that Mr. DICKENSON told Mrs. DICKENSON that

their daughter had fallen onto the baby.

46.      On March 13, 2016, Mrs. DICKENSON was interviewed by Army CID Special

Agents.  She stated that on March 12, 2016, she put both of her children to sleep in her home

with Brynnleigh Dickenson in the middle of the sofa in the living area and Deacon Dickenson in

a bouncer chair adjacent to the middle of the sofa.  Mrs. DICKENSON stated that she joined Mr.

DICKENSON in their bathroom to finish getting ready to attend an Easter Festival and later

heard a loud banging sound.  Mrs. DICKENSON stated that she then rushed into the living room

and saw Brynnleigh Dickenson climbing out of the bouncer chair with her feet bouncing on

Deacon Dickenson's chest.  Mrs. DICKENSON stated that she then picked up Deacon

Dickenson, ensured that he was not hut, and put him back to sleep.  Shortly thereafter Mrs.

DICKENSON gave Deacon Dickenson a bottle after which he vomited.  She then changed his

clothes and saw a bruise on his chest and side, and blood in his urine when she changed his

diaper.

47.      On March 14, 2016, Mr. DICKENSON was interviewed by CID Special Agents.

He was advised of his legal rights, which he waived.  He then provided a sworn statement

detailing that neither he nor Mrs. DICKENSON had ever physically abused Deacon Dickenson.

He stated that on March 12, 2016, he and his wife were in the bathroom together and their

children were sleeping in another room.  They then heard a bang, a cry from Deacon Dickenson,

and their daughter say "ooooo d."  He stated that Mrs. DICKENSON went into the living room

and told him that Brynnleigh Dickenson was pushing herself off of Deacon Dickenson, who was

in a bouncer chair.  He stated that when he entered the living room he saw Mrs. DICKENSON

feeding Deacon Dickenson.  Mr. DICKENSON returned to the bathroom but then his wife yelled

that Deacon Dickenson had vomited on her so he picked up Deacon Dickenson to give him a

bath and when he removed his clothing he saw bruising on the left side of his chest and he cried

at the slightest touch.  Mrs. DICKENSON removed his diaper and they saw blood in his urine, so

they took him to the hospital.

48.     On March 14, 2016, Mrs. DICKENSON provided a written statement to Army

CID Special Agents in which she stated that on March 12, 2016, at around 2:45 p.m.,  she and

Mr. DICKENSON were in their bathroom when they heard Brynnleigh Dickenson say "Oh, D"

followed by Deacon Dickenson screaming.  Mrs. DICKENSON stated that she immediately ran

into the living room to see Brynnleigh Dickenson's toes digging into Deacon Dickenson's chest

and Brynnleigh Dickenson getting onto the floor with the bouncer bouncing Deacon Dickenson's

head very hard up and down.  Mrs. DICKENSON stated that she picked up Deacon Dickenson

and comforted him and that he fell asleep in her arms, so she put him down in a tall swing by the

kitchen.  At 3:30 Deacon Dickenson woke up crying for a bottle and she fed him 2-2.5 ounces

from a bottle after which he projectile vomited on her.  She then ran a bath for him at which

point she noticed bruising and did a "touch exam on him" which caused her to believe that

"something was not right."  She then removed his diaper and saw blood at which point she knew

it was time to rush him to the hospital.  In this written statement, Mrs. DICKENSON also stated

that she was out of the house that morning and that, when she first returned home, she changed

Deacon Dickenson's diaper and that he did not have any bruising on his body at that point.  Mrs.

DICKENSON also stated that the bruises that she saw looked like they were caused by

Brynnleigh Dickenson's heel and toes.  She also stated that she measured her husband's hand

against the bruises and that they did not match.  When asked if Mr. DICKENSON had ever

struck the children, she stated no and that he would never hurt them.   Mrs. DICKENSON also

told the CID Special Agents that she had been seen at the Division of Behavioral Health at

LRMC hospital due to post-partum and emotional issues and had been placed on mood

stabilizers.[7]

49.     On March 14, 2016, Mrs. DICKENSON signed a written consent to allow CID

Special Agents to search her cell phone, a white and silver Samsung S4, DEC:

256691518602520979.  Special Agent Lewis collected the cell phone and conducted a Cellebrite

Logical Universal Forensic Extraction Device (UFED) examination.  The extraction did not

reveal any text messages, text message logs, or phone call logs.  The fact that the Samsung

telephone did not contain evidence of text messages or phone calls caused CID Special Agents to

believe that Mrs. DICKENSON possessed at least one other cell phone that she used to make and

receive phone calls and send and receive text messages; and/or that Mrs. DICKENSON may use

her social media accounts on Facebook and Twitter to send text messages.[8]

---

[7]  The Division of Behavioral Health is a department at LRMC hospital which provides counseling and
mental health services to Military Health System beneficiaries, including active duty service members and
their families.

[8]  In a written statement that Mrs. DICKENSON provided to Army CID on March 14, 2016, she stated
that she sent a text message to Mr. DICKENSON on March 12, 2016 at 10:41 a.m., which indicated that
she had a cell phone capable of sending text messages, and that she used that cell phone to send and
receive text messages.  It is unknown whether the text message was sent via her cell phone's text

50.    On March 22, 2016, Special Agent Ismael Camero administered a polygraph examination to Mr. DICKENSON.  During the post-instrument interview of Series 1 of the polygraph examination, Mr. DICKENSON stated that in late February 2016, Deacon Dickenson was sitting in his bouncer chair crying when Mr. DICKENSON saw Mrs. DICKENSON slap Deacon Dickenson across the face with her right hand.  Mr. DICKENSON stated that his wife raised her hand before slapping Deacon Dickenson with an open hand.  During the post-instrument interview of Series 2 of the polygraph examination, Mr. DICKENSON stated that on another occasion he observed Mrs. DICKENSON pushing the bouncer chair down to the floor and then releasing it, which caused Deacon Dickenson's head to jerk back and forth and caused him to cry.  Mr. DICKENSON stated that when they went to Garmish, Germany for vacation, Mrs. DICKENSON became annoyed when Deacon Dickenson cried and would forcefully elbow his car seat in an effort to make him be quiet.  Mr. DICKENSON stated that she did this both on the drive to and from Garmish.  Mr. DICKENSON stated that he did not disclose this information previously because he feared his wife who was short-tempered.

51.    On or about March 15, 2016, Mrs. DICKENSON exchanged text messages with Witness B in which she stated: "Please don't judge my husband"; and "I know that you are but I saw deacon naked when I got home from getting my hair done on Saturday he was not hurt.  My husband did not do this and it saddens me that anyone would think he did;" and "I saw deacon naked second after I cane [sic] home he was fine. My husband did not hurt my baby."

52.    On June 6, 2016, Mrs. DICKENSON came to Army CID offices in Kaiserslautern, Germany for a voluntary interview which was audio and video recorded.  She was advised of her Miranda rights and waived them via a printed form.  Mrs. DICKENSON

---

messaging system, or through Facebook messenger, Twitter direct messenger, or another mobile messaging application.

stated, inter alia, the following: On March 12, 2016, she left the house at 7:30 a.m. and was not home until about 3 p.m. that afternoon.  Mr. DICKENSON told her that Brynnleigh Dickenson fell on top of Deacon Dickenson that day, and that that was why she stated that to the hospital and to investigators.  After hearing what her husband said about her, hearing what the doctors have said, and learning about the extent of her son's injuries, she no longer believed her husband. March 12, 2016 was the first time that Mr. DICKENSON was alone with the children for such a long time period and that she thinks that he lost control.  She was out of the house doing errands and meeting friends that day, and when she came home Deacon Dickenson was in his bouncer chair whimpering and Brynnleigh Dickenson was asleep.  Mr. DICKENSON told her that he was whimpering because of a stomachache and she said that his whimpering did not sound like a stomachache.  Mr. DICKENSON told her that Brynnleigh Dickenson fell on Deacon Dickenson earlier that day.  Mrs. DICKENSON then put on her baby carrier and strapped Deacon Dickenson into it and he began crying.  She noted that he looked pale.  He subsequently projectile vomited, and when she unzipped his sleeper there was bruising all over the left side of his chest.  Because she arrived home at 2:30 or 3:00 p.m. and they left for the hospital at 4 p.m., she was only home with them for about an hour or so.  At the hospital, Mr. DICKENSON would not speak to any of the doctors so she had to talk to all of them.

**F.  Information Preserved by Facebook and Twitter**

53.     On or about April 6, 2016, a preservation request was submitted to Facebook for the following account: https://www.facebook.com/bailliehannah.  On April 6, 2016, Facebook confirmed that the account had been preserved.   On June 3, 2016, a preservation request was submitted to Twitter for the following account: www.twitter.com/bailliedickens1.  On June 3, 2016, Twitter confirmed that the account had been preserved.

21

### G. Conclusion

54. Based on the above, there is probable cause to believe that Mrs. DICKENSON and/or Mr. DICKENSON have committed the acts of assault, obstruction of justice, false statements, and misprision of a felony, in violation of 18 U.S.C. §§ 113, 1512, 1001, and 4, and other related crimes, and that evidence of these crimes may be located in the Facebook account https://www.facebook.com/bailliehannah, as fully described in Attachments A and B. Specifically, my investigation has revealed, inter alia, that:

a. Mrs. DICKENSON has made several statements regarding the injuries sustained by Deacon Dickenson, as well as other statements relevant to this investigation, online via Facebook and Twitter; and that certain of these statements are inconsistent with each other and inconsistent with certain statements that Mrs. DICKENSON and Mr. DICKENSON have made about Deacon Dickenson's injuries to law enforcement, friends, and medical professionals during the relevant time period;

b. Mrs. DICKENSON used web-based applications to speak with her mother Mrs. Dana Mooney-Hannah, which may include Facebook Video Chat, and that the logs of those phone calls would assist in pinpointing the timeframe during which Deacon Dickenson sustained his injuries;

c. Mrs. DICKENSON communicated with friends and family via Facebook and Twitter, and that her communications prior to and following March 12, 2016, the day that Deacon Dickenson was brought to LRMC hospital with severe non-accidental trauma injuries, would be relevant to her state of mind;

d. Mrs. DICKENSON communicated with others via Facebook and Twitter regarding the injuries sustained by Deacon Dickenson, including their causes and his treatment; and her perceptions of how medical personnel and Army personnel were handling Deacon Dickenson's case; and

e. Mrs. DICKENSON communicated with others about her emotional well-being and state of mind, and the state of her marriage, in the weeks and months prior to and following Deacon Dickenson's birth, and that any such communications that were

made through Facebook or Twitter may be stored electronically and would be relevant to her intent, her state of mind, and the criminal conduct under investigation.

55.     Additionally, I know through my training and experience that text messages may be sent via mobile phones, or through mobile applications such as Facebook Messenger or Twitter Direct Messenger.  Additionally, a user may video chat through Facebook Video Chat to make Internet based video phone calls through a desktop or laptop computer, a tablet, a mobile phone, or an Xbox gaming device.  The content of these communications, and the logs chronicling these communications, would be probative of the identity of the person who made certain phone calls, sent certain text messages, and posted certain content on Twitter or Facebook, which may be relevant to this investigation.

56.     Additionally, I know through my training and experience that in an investigation of this nature where a non-verbal infant has suffered multiple injuries indicating non-accidental trauma—including fractures and retinal injuries of various ages—it is critical to establish a detailed timeline to ascertain who was caring for Deacon Dickenson at the time that he sustained his injuries, which medical records have revealed to be of varying ages and not all acute to March 12, 2016.  Thus, evidence that shows whose care Deacon Dickenson was under in the days and weeks leading up to his presentation at LRMC hospital on March 12, 2016 is vital to this investigation.  As discussed above, see par. 13, my investigation causes me to believe that Mrs. DICKENSON and Mr. DICKENSON were the primary childcare providers for Deacon Dickenson from the time of his birth to the time that he presented at LRMC hospital on March 12, 2016.  Any electronic communications from Mrs. DICKENSON or Mr. DICKENSON that

shed light upon their whereabouts during this time period, including which of them was caring for Deacon Dickenson at any given point, are also relevant to this investigation.[9]

57.     Finally, the investigation has also revealed probable cause to believe that Mrs. DICKENSON may have threatened or assaulted Brynnleigh Dickenson, based on evidence from two eyewitnesses who personally overheard Mrs. DICKENSON threaten Brynnleigh Dickenson with physical harm; and based on the evidence that Brynnleigh Dickenson's brother, who was also primarily cared for by Mrs. DICKENSON, suffered non-accidental trauma while under the care of Mrs. DICKENSON.  Evidence of any threats or physical abuse by Mrs. DICKENSON against Brynnleigh Dickenson would also be probative of the identity of the person who caused the injuries to Deacon Dickenson.

## IV.     FACEBOOK BACKGROUND INFORMATION

58.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

59.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on

---

[9] The requested search authorization may reveal communications that potentially fall under the common law marital communications privilege, but law enforcement may use such communications to investigate crimes.  See United States v. Giavasis, 805 F.2d 1037, 1986 WL 18086, at *3 (6th Cir. Oct. 15, 1986); In re Grand Jury Investigation of Hugle, 754 F.2d 863, 866 (9th Cir. 1985); United States v. Harper, 450 F.2d 1032, 1045-1046 (5th Cir. 1971); United States v. Alexio, NO. 13-01017 JMS, 2015 WL 6181752, at *2–3 (D. Haw. Oct. 21, 2015); United States v. Carlson, 946 F. Supp. 2d 1115, 1128-1229 (D. Or. 2013); United States v. Irons, 646 F. Supp. 2d 927, 957 (E.D. Tenn. 2009) (citing Trammel v. United States, 445 U.S. 40, 53 n. 12 (1980)).

Facebook, which also stores copies of messages sent by the recipient, as well as other

information.  Facebook users can also post comments on the Facebook profiles of other users or

on their own profiles; such comments are typically associated with a specific posting or item on

the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant

messages through Facebook.  These chat communications are stored in the chat history for the

account.  Facebook also has a Video Chat calling feature, and although Facebook does not record

the calls themselves, it does keep records of the date of each call.

60.     Facebook asks users to provide basic contact and personal identifying information

to Facebook, either during the registration process or thereafter.  This information may include

the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state,

and zip code), telephone numbers, screen names, websites, and other personal identifiers.

Facebook also assigns a user identification number to each account.

61.     Facebook maintains electronic records pertaining to the individuals and

companies for which they maintain subscriber accounts.  These records may include account

access information, e-mail transaction information, and account application information.  In

some cases, Facebook users may communicate directly with Facebook about issues relating to

their accounts, such as technical problems, billing inquiries, or complaints from other users.

Social networking providers like Facebook typically retain records about such communications,

including records of contacts between the user and the provider's support services, as well as

records of any actions taken by the provider or user as a result of the communications.

62.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

63.     Subscribers to Facebook may access their accounts on server maintained and/or owned by Facebook from any computer connected to the Internet located anywhere in the world.  Facebook retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

64.     Any digital information that is sent to a Facebook subscriber is stored in the subscriber's "account files" on Facebook servers until the subscriber deletes the digital information of the subscriber's account files.  If the digital information is not deleted by the subscriber, the account is below the maximum limit, and the subscriber accessed the account periodically, that digital information can remain on Facebook servers indefinitely.

65.     When the subscriber sends digital information, it is initiated at the subscriber's computer, transferred via the Internet to Facebook server, and then transmitted to its end destination.  Facebook users have the option of saving a copy of the digital information sent.  Unless the sender of the digital information specifically deletes the digital information from the server, the digital information can remain on the system indefinitely.  The sender can delete the stored digital information thereby eliminating it from the account files maintained at Facebook, but that digital information will remain in the recipient's account files unless the recipient deletes

it as well or unless the recipient's account is subject to account size limitations.  A Facebook subscriber can also store files, including e-mails and image files, on servers maintained and/or owned by Facebook.

66.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

67.     Digital information and image files stored on a Facebook server by a subscriber may not necessarily be located in the subscriber's home computer.  The subscriber may store digital information and/or other files on the Facebook servers for which there is insufficient storage space in the subscriber's computer and/or which he does not wish to maintain in the computer in his residence.  A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the Facebook server.

68.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## V.  INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

69.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## VI.     SEARCH PRODECURE

70.     In order to ensure that agents executing this search warrant only seize those computer accounts and/or computer files described in the Attachment B, Section II (Items to be Seized by the Government), the following procedures will be implemented:

e.     The search warrant will be presented to Facebook Law Enforcement Response Team (FLERT) personnel by law enforcement agents.  FLERT personnel will be directed to isolate those accounts and files described in Attachment B, Section I (Information to be Disclosed by Facebook);

f.     In order to minimize any disruption of computer service to innocent third parties, the system administrator will create an exact duplicate of the accounts and files described in Attachment A, including an exact duplicate of all information stored in the computer accounts and/or files described Attachment B, Section I;

g.     The FLERT administrator will provide the exact duplicate of the accounts and files described in Attachment B, Section I and all information stored in those accounts and/or files to the Special Agent who serves this search warrant; and

h.     Law enforcement personnel will thereafter review the information stored in the accounts and files received from the system administrator and then identify and copy the information contained in those accounts and files which are authorized to be seized by Attachment B, Section II.

## VII.    REQUEST FOR SEALING

70.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because these documents discuss an ongoing criminal investigation that is not public.  To the extent that certain targets are

aware of an ongoing criminal investigation, they are not aware of the direction in which the investigation is proceeding and what evidence law enforcement is seeking to obtain.  Disclosure of the contents of the affidavit may cause targets to flee or destroy evidence; and may cause witnesses alluded to in the affidavit to be subject to harassment or retaliation from individuals targeted by the investigation or with an interest in its outcome.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

Respectfully submitted,

_____

Jonathon Parker
Special Agent
United States Army Criminal Investigation
Command (CID)

Subscribed and sworn to before me
on:

_____
DATE

_____
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USERNAME BAILLIE RACHELLE
DICKENSON THAT IS STORED AT PREMISES          **Filed Under Seal**
CONROLLED BY FACEBOOK

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Facebook user account

https://www.facebook.com/bailliehannah, , associated with Facebook ID number 508741638,

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a

company headquartered in Menlo Park, California.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME BAILLIE RACHELLE DICKENSON THAT IS STORED AT PREMISES CONROLLED BY FACEBOOK | **Filed Under Seal** |

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user account and user number listed in Attachment A:

a.      All contact and personal identifying information related to the account https://www.facebook.com/bailliehannah (the "Account"), including the Account holder's full name, user identification number, birth date, gender, contact e-mail addresses, length of service, physical addresses (including city, state, and zip code), telephone numbers, screen names, websites, billing information, and other personal identifiers associated with the Account;

b.      All records of communications and messages made or received by the user, including all emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, and "Friend" requests and "friends" that have been deleted;

      c.     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

      d.     All past and present lists of friends created by the account;

      e.     All "followers" information including a list of people who follow the user and the list of people who the user follows;

      f.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

      g.     All "check ins" and other location information that help reveal the location of the account user;

      h.     All IP logs, including all records of the IP addresses that logged into the account that help reveal the location of the user of the account;

      i.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number).

      j.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

      k.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the Government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 113 (assault within maritime and territorial jurisdiction of the United States), 18 U.S.C. § 1512 (obstruction of justice), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 4 (misprision of a felony) and other related crimes, involving Mrs. Baillie Rachelle Dickenson ("Mrs. Dickenson") and/or Mr. Derreck Kyle Dickenson ("Mr. Dickenson"), from December 18, 2015 to the present, including, for the account name and user account number identified on Attachment A, information pertaining to the following matters:

a.     All records, content, activity logs, and other documents showing the user's posts and other Facebook activities, relating to the identity and location of the user of the account, https://www.facebook.com/bailliehannah (the "Account"), or that would help to identify the user of the account and his or her location;

b.     All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, between Mrs. Dickenson and Mr. Dickenson;

c.     All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, relating to Brynnleigh Dickenson or Deacon Dickenson;

d.     All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, relating to the identity or location of the targets, including those records that identify under whose care Deacon Dickenson was between December 18, 2015 and March 12, 2016;

e.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, related to Mrs. Dickenson or Mr. Dickenson's state of mind in the months preceding or following Deacon Dickenson's birth, as they relate to the crimes under investigation;

f.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings regarding any injuries sustained by Deacon Dickenson, and/or any threats, mistreatment, or abusive behavior directed to Deacon Dickenson by any person, between December 18, 2015 and the present;

g.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings regarding any injuries sustained by Brynnleigh Dickenson and/or any threats, mistreatment, or abusive behavior directed to Brynnleigh Dickenson by any person, between November 6, 2014 and the present;

h.       All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, regarding any injuries ever sustained by Deacon Dickenson;

i.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, regarding any injuries ever sustained by Brynnleigh Dickenson;

j.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, regarding the health and development of Deacon Dickenson, including any concerns Mrs. Dickenson, Mr. Dickenson, or others had regarding any developmental delays for Deacon Dickenson, any injuries Deacon

Dickenson suffered at birth, and any issues regarding Deacon Dickenson that were discussed or raised at his medical appointments;

k.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings regarding the mental health of Mrs. Baillie Dickenson, to include the medications that she was prescribed, information regarding whether and when she took her medication(s), and information regarding her symptoms, from November 6, 2014 to the present;

l.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, relating to the use of Facebook Video Chat , FaceTime, or other programs designed to facilitate web-based phone calls between Mrs. Dickenson, Mr. Dickenson, Brynnleigh Dickenson, or Deacon Dickenson, and their friends and relatives, including Dana Mooney-Hannah, from December 18, 2015 to the present;

m.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings, relating to the Internet browsing of Mrs. Dickenson and/or Mr. Dickenson between December 18, 2015 and the present;

n.      All records, including emails, messages, chats, posts, photos, videos, video calling history, recordings, or other communications or postings relating to the concealment of any injuries that were caused to Deacon Dickenson between December 18, 2015 and March 12, 2016, and related to the destruction, attempted destruction, and/or concealment of any communications or other evidence relating to any injuries caused to Deacon Dickenson between December 18, 2015 and March 12, 2016, and relating to the subsequent investigation;

o.      All past and present lists of friends created by the account that will help to identify the user of the account;

p.      All "check ins" and other location information that help reveal the location of the account user;

q.      All IP logs, including all records of the IP addresses that logged into the account that help reveal the location of the user of the account;

r.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

s.      Any records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services, and all records of actions taken, including suspensions or terminations of the account.

III.    **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

Additionally, in order to ensure that agents executing this search warrant only seize those computer accounts and/or computer files described in the Attachment B, Section II (Items to be Seized by the Government), the following procedures will be implemented:

a.      The search warrant will be presented to Facebook Law Enforcement Response Team (FLERT) personnel by law enforcement agents.  FLERT personnel will be

directed to isolate those accounts and files described in Attachment B, Section I (Information to be Disclosed by Facebook);

b.   In order to minimize any disruption of computer service to innocent third parties, the system administrator will create an exact duplicate of the accounts and files described in Attachment A, including an exact duplicate of all information stored in the computer accounts and/or files described Attachment B, Section I;

c.   The FLERT administrator will provide the exact duplicate of the accounts and files described in Attachment B, Section I and all information stored in those accounts and/or files to the Special Agent who serves this search warrant; and

d.   Law enforcement personnel will thereafter review the information stored in the accounts and files received from the system administrator and then identify and copy the information contained in those accounts and files which are authorized to be seized by Attachment B, Section II.

**IV.   By Order of the Court**

Pursuant to 18 U.S.C. § 2705(b), the Court orders Facebook not to notify any person of the existence of this warrant for 180 days from service of this attachment.